MICHAEL STENGER, Appellant, v. THE BUFFALO UNION FURNACE COMPANY, Respondent.

NEGLIGENCE. The facts examined in an action to recover for injuries to plaintiff resulting from the defective condition of a blast furnace at which plaintiff was employed, by reason of which a much larger quantity of gas was allowed to escape than would have escaped if the furnace had been kept in good repair, whereby the plaintiff was made unconscious, and, falling into the hopper of the furnace, received severe burns and injuries and, *held*, that the evidence was sufficient to sustain a verdict for plaintiff.

*Stenger* v. *Buffalo Union Furnace Co.*, 107 App. Div. 621, reversed.

(Argued October 18, 1906; decided November 13, 1906.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered August 22, 1905, which reversed a judgment in favor of plaintiff, entered upon a verdict and an order denying a motion for a new trial, and granted a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*George H. Kennedy* for appellant. It was a question for the jury whether the gas which overcame the deceased and

caused him to fall into the hopper came from the defects existing in the furnace. (*McHugh* v. *M. Ry. Co.*, 179 N. Y. 378; *Nelson* v. *City of New York*, 101 App. Div. 18; *Eastland* v. *Clark*, 165 N. Y. 420; *Welle* v. *Celluloid Co.*, 175 N. Y. 401; *Kiras* v. *N. C. Co.*, 59 App. Div. 79; *Davidson* v. *Cornell*, 132 N. Y. 228; *McGovern* v. *C. V. R. R. Co.*, 123 N. Y. 280; *Dowd* v. *N. Y., O. & W. R. R. Co.*, 170 N. Y. 459; *Leland* v. *Hearn*, 49 App. Div. 111; *Devereux* v. *U. S. C. Mills*, 84 App. Div. 34.)

*Clinton B. Gibbs* for respondent. The plaintiff did not meet the burden of proof resting upon him to establish by a fair preponderance of evidence that he had been overcome by gas, or had fallen, or received his injuries through any cause for which the defendant can be blamed. (*Stenger* v. *B. U. F. Co.*, 98 App. Div. 361; *Witlock* v. *F. & C. Co.*, 149 N. Y. 49; *F. L. & T. Co.* v. *Siefke*, 144 N. Y. 354; *Hale* v. *Smith*, 78 N. Y. 480; *Heinemann* v. *Heard*, 62 N. Y. 448; *Ring* v. *Cohoes*, 77 N. Y. 83; *Jones* v. *Union R. Co.*, 18 App. Div. 267.) There is no evidence in the case that the plaintiff was overcome by gas that leaked into the air because of the defendant's negligence, any more than by the gas that got there through natural and unavoidable conditions. (*Ring* v. *Cohoes*, 77 N. Y. 83; *Searles* v. *M. R. Co.*, 101 N. Y. 662; *Taylor* v. *City of Yonkers*, 105 N. Y. 571; *Ayres* v. *Village of Hammondsport*, 130 N. Y. 665; *Rider* v. *S. R. T. R. Co.*, 171 N. Y. 139; *Williams* v. *D., L. & W. R. R. Co.*, 39 Hun, 430; *Malone* v. *B. & A. R. R. Co.*, 51 Hun, 532; *Koch* v. *Fox*, 71 App. Div. 288.)

Haight, J. This action was brought to recover damages for personal injuries alleged to have been sustained by the plaintiff through the negligence of the defendant on the 17th day of April, 1903.

The defendant was the owner operating a blast furnace in the city of Buffalo, and the plaintiff was in its employ and worked on the top of the furnace. The furnace was about

eighty feet high, circular in shape, with a diameter at the base of twenty-two feet, and at the top of about fourteen feet. The top was covered with what is called an iron hopper in the form of a suspended cone extending down into the furnace with a circular opening in the center, through which is suspended a large bell-shaped casting, so adjusted to an iron beam over the top of the furnace that it could be raised up into the hole in the center of the hopper sufficient to close it and prevent the escape of gas and fire. When in operation the furnace is fed from the top. The coke or fuel is raised up from the ground by mechanical appliances, in what are called buggies, and then with the scrap iron or iron ore is dumped into the hopper, and at frequent intervals the bell is lowered, allowing the contents of the hopper to slide down through the opening, and, by reason of the flange of the bell, distributed around the outer sides of the furnace, where it becomes fused from the fire and heat beneath. After the contents of the hopper has thus been discharged the bell is again raised up, closing the hole, thus permitting the refilling of the hopper. To facilitate the dumping of the buggies into the hopper there was a platform constructed at the top of the furnace with a small house at one end, some distance from the furnace, in which the men could stay and be shielded from the fire and gas escaping from the furnace when the bell was lowered, and from which they could pass to the top of the furnace when necessary to dump a buggy filled with fuel or ore. The plaintiff and his brother were in the employ of the defendant engaged in dumping the material into the hopper, and from thence into the furnace from time to time by the lowering of the bell. About four o'clock in the morning of the day of the accident, the plaintiff was in the house referred to upon the top of the platform with his brother. A buggy of material had come up from below, and his brother went out to the top of the furnace to dump it. The brother remaining longer than usual, the plaintiff stepped out to see what had become of him, and as he did so he saw him stagger and then fall into the hopper. The plaintiff, as

he tells us, then called for help, and instantly ran to the top of the furnace and reached down with one hand to get hold of his brother, and in doing so he himself inhaled gas, fell upon the hopper and became unconscious. He was shortly thereafter rescued, taken down to the ground and revived, but his brother died. The plaintiff received severe burns which laid him up for several weeks, and it is for the injuries so received that the jury has awarded him damages.

The questions presented upon this review are as to whether the plaintiff presented any evidence from which the jury could have found negligence on the part of the defendant, and the want of contributory negligence on the part of the plaintiff. In order to answer these questions, it will become necessary to examine with some care the evidence produced upon the trial as to the manner in which this furnace was equipped and operated. It appears that in the operation of a blast furnace a great amount of gas is generated, and that of necessity a considerable quantity escapes and impregnates the atmosphere. When the bell is lowered so as to permit the coke and ore to slide into the furnace, the gas and a flame of fire shoots out into the air in great quantities. It also appears that a pipe had been constructed from the top of the furnace running down to the bottom, through which the gas was conducted and there made to serve as fuel to the fire inside of the furnace. There were also constructed near the top of the furnace two large steel doors, which hung upon hinges hanging downward so that they would close by their own weight, which were called explosion doors. Their purpose was to relieve the furnace when the pressure of gas inside became too great; on such occasions the doors would fly up allowing the gas to escape and thus relieve the furnace from the over-pressure. The defendant had constructed the house in question to shelter the men and to guard them against injury while working on the top of the platform, by reason of the escape of fire and gas from these sources. It had also so arranged that it was necessary for but one man to go out at a time to dump a buggy, and then to remain but a brief time,

and had provided shifts of men to take the places of those upon the platform at frequent intervals or whenever any one felt the ill effects of the escaping gas. The company had also provided clay with which to fill in the cracks around the explosion doors, and salamoniac and iron borings to fill in around the iron plates of the hopper, in order to prevent as far as possible the escape of gas from the furnace. These precautions taken on the part of the defendant were doubtless ample and sufficient to afford reasonable protection to the men in its employ if they observed proper care and caution. But it is now claimed on behalf of the plaintiff that the defendant had permitted the furnace to get sadly out of repair, and that by reason thereof a much larger quantity of gas was allowed to escape than would have had the furnace been kept in good repair, and that the injury to the plaintiff resulted in consequence of such escape. This brings us to a consideration of the controverted evidence in the case. It distinctly appears from the testimony of several witnesses produced on the part of the plaintiff that the explosion doors were not only cracked but badly warped; that there was a displaced brick under the hopper so as to leave an opening between the hopper and the brickwork of from four to six inches; that some of the plates had been cracked and that one had been removed; that one explosion door was unpacked with clay, and that it was vibrating back and forth by reason of the gas inside, and that the foreman in charge had refused to stop the blowpipe from beneath sufficiently long to allow the door to be packed. This evidence was all sharply controverted by the defendant's witnesses, whose testimonies tended to show that the furnace was in proper condition and repair. The learned presiding justice, writing for the Appellate Division, in granting a new trial, conceded that the evidence bearing upon this question was of such a character as to raise a question of fact as to that issue, and justified the jury in finding that the defendant was negligent in respect to those matters. But following such concession he then proceeded to state that, " The serious question presented by this appeal

is whether or not there is any evidence which tends to show
that any gas has escaped because of either of the defects
referred to and from which the injury to the plaintiff
resulted." And then, after considering the evidence, he
reached the conclusion that there was no such evidence. In
this particular we have reached a different conclusion.

Assuming, as we must from the verdict rendered, that the
defects complained of existed at the top of the furnace, it is
within the common knowledge and experience of ordinary
men at the present day that the gas generated in the opera-
tion of a furnace of this character will escape in large quanti-
ties through the cracks and holes described by the witnesses.
Indeed, this is conceded by several of the defendant's wit-
nesses. They even go to the extent of claiming that in case
the cracks and holes were of the dimensions claimed by
the plaintiff's witnesses it would not be possible for men to
work there, that the gas would escape in such volumes that
it would consume and burn them up. The defendant's wit-
ness Smoot, on cross-examination, said : " If you have these
holes they testified to in these plates, the gas would come up."
Thomas Marron, the defendant's yard superintendent, said :
" Gas always exists at the top of a furnace while it is in blast
or in operation. It comes from the combustion of the stock
inside, coming up through the pores of the brick. There is
no way to confine it absolutely. It will escape the best you
can do to prevent it and it passes into the air above the fur-
nace. * * * If holes three-quarters of an inch to an inch
wide and four feet long existed at the bell extension and at
the hopper extension of three feet long, it would not be possi-
ble for the men to work there on account of the escape of
such a large volume of gas. It would consume the men, burn
them up. After it struck the air and was ignited it would be
flame. It would blow anywheres from ten to twenty feet
high. The men could not work there. They would burn
up. It is not possible to operate a furnace under such con-
ditions." Schroeder, another of the defendant's witnesses,
testified that : " All furnaces leak more or less gas. It will

penetrate right through the brick.    *    *    *    If there was a hole three-fourths of an inch in width and four feet or one-half an inch in width or three feet long in the bell extension, it would be impossible to operate the furnace because the gas and flame would come out through these openings and the men could not work there." Patrick O'Brien, another of the defendant's witnesses, testified that he was working at the furnace at the time the plaintiff was injured. He said it was very gassy that night at the top of the furnace because of the east wind, and also that he was taken down from the furnace that night because he was overcome and gassed at the time of this accident; that it was very gassy up there; said he was affected by the gas; that it affected his knees and that it overcame him altogether. It thus appears to us that there was evidence which tended to show that if the appliances at the top of the furnace were out of order by reason of cracks or holes that the gas would escape through such openings and augment or increase the danger to the men working upon the platform over and above that which necessarily existed with the appliances in good condition and repair, and that the jury might have found that the injury which the plaintiff suffered was in consequence of such increased discharge of gas.

Some exceptions were taken by the defendant to the admission and rejection of evidence upon the trial. The Appellate Division did not discuss any of them and none of them were orally argued. We have examined them and have reached the conclusion that no error of sufficient importance to justify a reversal was committed by the court.

The order of the Appellate Division should be reversed and the judgment entered upon the verdict affirmed, with costs to the plaintiff in the Appellate Division and this court.

Cullen, Ch. J., Vann, Werner and Willard Bartlett, JJ., concur; Gray, J., absent; Hiscock, J., not sitting.

Ordered accordingly.